**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **WALLACE WIGLEY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| v. ) | **CIVIL ACTION NO 08-00535-KD-C** |
| ) | |
| **R&D MAINTENANCE SERVICES, INC.,** ) | |
| ) | |
| **Defendant.** ) | |

**ORDER**

This matter is before the Court on Defendant's Motion for Summary Judgment (Docs. 21, 22, 23), Plaintiff's Response in opposition (Docs. 25, 26), Defendants' Reply thereto (Docs. 27, 28) and Plaintiff's Sur-Reply (Doc. 41). For the reasons set forth herein, the Defendant's motion for summary judgment is **DENIED.**

**I.    Background**

Plaintiff Wallace Wigley ("Wigley") initiated this action on August 20, 2008 in the Circuit Court of Marengo County, Alabama (CV-2008-062), asserting an age-based discrimination claim against Defendant R&D Maintenance Services, Inc. ("R&D") under Alabama's Age Discrimination in Employment Act ("AADEA"), Alabama Code § 25-1-20 et seq. (Doc. 2-2). Wigley alleges that he was terminated by R&D on January 16, 2007 due to his age (over 40 years old). (Id.) Wigley alleges further that R&D has a pattern and practice of terminating employees over the age of 40 and replacing them with substantially younger employees. (Id.)

On September 18, 2008, Defendant R&D timely removed this case on the grounds of federal diversity jurisdiction insofar as Wigley is an Alabama resident, R&D is a corporation incorporated

in Oklahoma and whose principal place of business is in Oklahoma. (Doc. 2). On September 23, 2008, R&D filed its Answer to Wigley's Complaint, in which it denied taking any action against Wigley in violation of the AADEA. (Doc. 3). The matter is now before the Court on R&D's motion for summary judgment. (Docs. 21, 22, 23).

## II.     Findings of Fact[1]

Defendant R&D Maintenance Services, Inc. ("R&D") performs contract maintenance on locks, dams, parks and recreation areas for the Department of the Army Corps of Engineers. (Doc. 23 at Ex. 1 at 13, Ex. 3 at 24). R&D operates two offices in the State of Alabama – in Tuscaloosa and Demopolis. (Id. at Ex. 2 at 25). Plaintiff Wallace Wigley ("Plaintiff") is 59 year-old former employee of R&D's facility in Demopolis, Alabama, where he worked as a Heavy Diesel Mechanic/Heavy Equipment Mechanic. (Doc. 1; Doc. 2-2; Doc 23 at Ex. 3 at 112, 167).

Gary Mills ("Mills") is R&D's Owner and President. (Doc. 23 at Ex. 5 at ¶¶1-2). Brooks Ferguson ("Ferguson") is R&D's Project Manager who oversees both the Demopolis and Tuscaloosa facilities. (Id. at Ex. 2 at 22-23, Ex. 3 at 188-189). Ferguson reports directly to Mills as well as Jerry Fulkerson ("Fulkerson"), R&D's Vice-President. (Id. at Ex. 2 at 22). Mike Fuqua ("Fuqua") is R&D's Project Superintendent over the Tuscaloosa facility; he reports to Ferguson. (Id. at Ex. 6 at 24, 26-27). Jerry Montgomery ("Montgomery") is R&D's Project Superintendent over the

---

[1] When ruling on a motion for summary judgment, the court views "the evidence and all reasonable inferences in the light most favorable to the non-moving party." See, e.g., Battle v. Board of Regents for Ga., 468 F.3d 755, 759 (11th Cir. 2006). The exhibits referenced in this Section include the following from Doc. 22: Mills Deposition (Ex. 1); Ferguson Deposition (Ex. 2); Wigley Deposition (Ex. 3); Charge of Discrimination (Ex. 4); Mills Affidavit (Ex. 5); Fuqua Deposition (Ex. 6); Montgomery Deposition (Ex. 7); Crawford Deposition (Ex. 8); Plaintiff's signed acknowledgment of Company Rules (Ex. 9); Company Rules (Ex. 10); and Plaintiff's Unemployment Compensation Claim (Ex. 11).

Demopolis facility and he oversees all work sites, crews, time sheets, scheduling and personnel; he reports to Ferguson. (Id. at Ex. 6 at 44, Ex. 7 at 20). James Crawford ("Crawford") is the Supervisor at the R&D Demopolis facility and works under Montgomery; both supervise the same people – including Plaintiff while he was employed by R&D. (Id. at Ex. 7 at 21, Ex. 8 at 15, 19).

Wigley was hired by R&D on June 21, 2006 as a Heavy Diesel Mechanic at the company's Marengo County location in Demopolis, Alabama, and commenced working for R&D on June 26, 2006. (Doc. 2-2 at 6; Doc. 23 at Ex. 3 at 112, 147, 167). As a Heavy Diesel Mechanic, Wigley serviced large trucks, large tractors and bulldozers. (Doc. 23 at Ex. 3 at 166-168). Wigley's work hours were from 7:30 a.m. to 3:30 p.m., Monday through Friday, and his immediate supervisor was Montgomery, who in turn reported directly to Ferguson, the Project Manager. (Id. at Ex.3 at 168, Ex. 7 at 21, 58). As part of his employment, Wigley was assigned a set of keys that allowed him access to the shop and various buildings on R&D's work facility and provided with a radio so that R&D could reach him for equipment repairs. (Id. at Ex. 7 at 69-70).

Wigley received a copy of R&D's Company Rules at the beginning of his employment. (Id. at Ex. 3 at 144-145, 148, Ex. 9). R&D's Company Rules contained a "Prohibited Employee Harassment Policy" which expressly prohibits harassment, including harassment based upon age; this policy was in effect during Wigley's employment. (Id. at Ex. 2 at 123-124, Ex. 7 at 39, Ex. 8 at 65-66, Ex.10). Employee discrimination against another employee on the basis of age is a terminable offense. (Id. at Ex. 7 at 41-42). R&D's Company Rules also identify types of misconduct that may result in progressive discipline up to and including discharge, such as leaving the work station without permission, preparing to quit work for the day prior to a specified time and leaving the facility during work hours without permission from the Project Superintendent. (Doc.

23 at Ex. 10). However, Wigley could leave the facility without notifying his supervisor if the reason for leaving was related to his work. (Id. at Ex. 3 at 156-159, Ex. 7 at 27-29; Doc. 26-12 at ¶3).

About half-way through his employment with R&D, a few weeks after Wigley reported another employee (Crawford) to the Safety Department, Montgomery began calling Wigley names like "old son of a bitch" and "old bastard" about "50 times" and Wigley "started getting trash from Jerry Montgomery." (Doc. 23 at Ex. 3 at 193-194, 198-207). Wigley testified that Montgomery had already called him an "old bastard" before then as well. (Id. at 205).

In approximately December 2006, Wigley complained to Fuqua about the "nasty comments and names" Montgomery was making to him concerning his age -- ("Old bastard, old son of a bitch, you're too old to do this job, you need to get gone. I mean that was a common thing with Jerry Montgomery. It happened many times[]") – and requested a transfer to the Tuscaloosa facility. (Id. at 323, 372-374). Wigley testified that this was not the first time he had told Fuqua about Montgomery's actions. (Id. at 373).

On the morning of January 11, 2007, Wigley and a co-worker (Ray Simmons) were unloading oil filters from Simmons' truck when Montgomery approached them and told Wigley that the dozer was needed, complaining that it still had not been serviced. (Doc. 23 at Ex. 3 at 224-225, Ex. 7 at 67). The dozer had been on the schedule for Wigley to service for several weeks. (Id. at Ex. 2 at 65, Ex. 7 at 97-99). Wigley had not serviced the dozer at that time because he needed timbers moved in order to do so. (Id. at Ex. 3 at 225). Wigley testified that Montgomery "was violently complaining because the dozer hadn't been serviced." (Id. at 229). Wigley asked Montgomery to help him move some timbers so that he could service the dozer, and Wigley testified

4

that during this conversation, Montgomery called him an "old son of a bitch" two to three times, called him an "old bastard" and told him he was "too old to do the damn job." (Doc. 26-12 at ¶ 5; Doc. 23 at Ex. 3 at 229-230, 235-236, 370-371). After this conversation, Wigley asked Montgomery to come into the shop and asked him "why are you acting like this . . . you and I have never had any trouble; why are you being so abrasive, trying to humiliate me, degrade me, all the time here lately . . . its something every day; what's wrong; what can I do to fix it. . . ." (Doc. 23 at Ex. 3 at 230). Before Montgomery could respond, Sam Pastor (a supervisor employed by the Corps and a customer) came into the shop and Montgomery left to meet with him. (Id. at 230-231)

After Montgomery left with Pastor, Wigley asked Annie Barton (an Accounting Clerk at R&D who works under the supervision of Montgomery) to hold his keys and radio while he went to the Tuscaloosa facility, until he "could find out what was going to happen with this, because I didn't know whether I would be fired, dismissed, told to go back to work. I didn't know what was going to happen when I got to Brooks Ferguson, but I never told anybody I quit." (Doc. 23 at Ex. 3 at 221; Doc. 26-2 at ¶¶ 2, 4). Wigley communicated to Barton that he was going to Tuscaloosa to complain to Ferguson about Montgomery, and that he was not sure what was going to happen or when or whether he would be back because he "had no idea what was going to be the outcome of me going up there." (Doc. 26-2 at ¶ 4; Doc. 23 at Ex. 3 at 221-222, 232-233; Doc. 26-12 at ¶ 9).[2] Wigley left the Demopolis facility because he was mad and humiliated about the way Montgomery

---

[2] Wigley testified that prior to his employment with R&D, he left most of his employers on bad terms and actually quit 10 jobs by "walk[ing] out the door," "hand[ing] him the keys" and "walked off the job" without ever providing any employer with notice of his resignation; indeed, he cannot recall ever using the words "I quit" when he resigned from any of these employers and testified that he believes that his employers just "knew [he] was done and "knew he no longer wanted to be employed there" because he would turn in his "stuff" which "signified to them that [he] was quitting." (Doc. 23 at Ex. 3 at 32-35, 42, 44-46, 51, 61-67).

treated him.  (Doc. 23 at Ex. 3 at 234; Doc. 26-12 at ¶ 9).  As he was leaving, Wigley heard Brian Finley tell Montgomery "your mechanic just quit."  (Doc. 23 at Ex. 3 at 233-234, 238-240).  At the time Wigley left, his shift was not over.  (Id. at 240, 249).

Barton took Wigley's keys and radio to Montgomery and told him that Wigley was going to Tuscaloosa to talk to Ferguson to complain about Montgomery and to try to receive a transfer.  (Doc. 26-2 at ¶¶ 6, 8).  According to Barton, Montgomery stated: "Old Bastard, he should have known he could not do the job."  (Id. at ¶ 8).  Montgomery called Ferguson and told him that "his mechanic had just quit."  (Doc. 23 at Ex. 2 at 53, Ex. 7 at 68).

After leaving the Demopolis R&D facility, Wigley drove straight to R&D's Tuscaloosa facility and went to Ferguson's office where he met with Ferguson and Mike Fuqua (R&D's Project Superintendent for Tuscaloosa).  (Doc. 23 at Ex. 2 at 58, Ex. 3 at 251-252).  Wigley told Ferguson that he was there "without permission," to which Ferguson responded that he did not need permission because he had "already quit," in reply to which Wigley said "no, I didn't quit, didn't tell nobody I did."  (Doc. 23 at Ex. 3 at 253, 331; Doc. 26-12 at ¶¶ 11-13).  Ferguson testified that Wigley came to see him to tell him what happened and to seek reinstatement.  (Doc. 23 at Ex. 2 at 60-61).  Wigley told Ferguson and Fuqua what happened that morning at the Demopolis facility, stating that Montgomery had used an improper tone of voice with him.  (Id. at Ex. 2 at 58-59, Ex. 3 at 253-254, Ex. 6 at 35-37).  Ferguson told Wigley that because he left the job and turned in his keys and radio, R&D believed that he had quit.  (Id. at Ex. 6 at 37-38, 43, 83-84).  Ferguson told Wigley "everything will be okay."  (Id. at Ex. 3 at 254-255).  Wigley asked Ferguson and Fuqua if he could work at R&D's Tuscaloosa facility.  (Id. at Ex. 3 at 255-256).  Ferguson told Wigley that there was not a mechanic position open in Tuscaloosa and that he would have to get with the home

6

office to see if Wigley could be reinstated and call him later that day. (Id. at Ex. 3 at 256, Ex. 6 at 43).

Ferguson called Mills and told him that Wigley had walked off the job, turned in his keys and radio and had asked to be reinstated to a position in Tuscaloosa. (Doc. 23 at Ex. 1 at 50-53, 55-56). Mills directed Ferguson to investigate by talking with the supervisors to ensure they understood what happened and to meet with Wigley again later. (Id. at 54, 82). Even though Mills believed that Wigley had quit his job based on his actions of walking off the job without permission and turning in his keys and radio, he wanted to make sure everyone understood what happened that day and wanted to discuss Wigley's request for reinstatement. (Id. at 57).

At 2:00 p.m. that day, Ferguson called Wigley and told him to report to the Tuscaloosa facility the following Tuesday morning, January 16, 2007, when they would talk and get everything straightened out and that "I think I can fix this." (Doc. 23 at Ex. 3 at 259-260; Doc. 26-12 at ¶13). Ferguson told Wigley to report to work on Tuesday morning and go to spill response training and then "we'll have a meeting . . . we'll get you straightened out." (Doc. 23 at Ex. 3 at 260, 265-266). Ferguson testified that he wanted to arrange a meeting during which all of the supervisors could be present to review the events that took place with Wigley, in order for them to make a decision regarding his reinstatement. (Id. at Ex. 2 at 79-80, Ex. 6 at 53).

On January 14, 2007, Wigley filed a claim for unemployment compensation, in which he swore under oath that his employment with R&D ended on January 11, 2007. (Id. at Ex. 3 at 324-325, Ex. 11 (Notice of Claim for Unemployment Compensation)).

On January 16, 2007,[3] Wigley reported to the Tuscaloosa facility at 7:00 a.m. and signed in

---

[3] Monday, January 15, 2007, was a federal holiday and R&D was closed.

7

to work and attended a safety meeting and a spill response meeting. (Id. at Ex. 3 at 260, 264-266). Some time later that day, Fuqua came to the safety meeting and got Wigley and took him into Ferguson's office. (Id. at Ex. 3 at 260). The R&D employees testified that Wigley then met with Ferguson, Fuqua, Montgomery and Crawford; Ferguson again stated that because Wigley left the job site without permission after turning in his keys and radio, R&D believed that he had quit. (Id. at Ex. 1 at 60-61, Ex. 2 at 80-81, Ex. 6 at 59, 83-84, Ex. 8 at 43-48, 61). R&D's employees testified that during this meeting, Wigley did not dispute that he had quit, nor did Wigley make any reference to age or allege that Montgomery had called him old. (Doc. 23 at Ex. 2 at 89, 102-103, Ex. 6 at 83-84, Ex. 8 at 45, 47, 61). In contrast, Wigley states that he repeatedly emphasized throughout the January 16 meeting that he did not quit or abandon his job, but rather, that he had driven to Tuscaloosa to complain about Montgomery's discriminatory treatment of him and that during the meeting, he identified Montgomery's references to his age and offensive remarks based on age. (Doc. 23 at Ex. 3 at 372-373; Doc. 26-12 at ¶¶11-13, 15).

Following the group meeting, Wigley was asked to step out so that Ferguson and the others could contact Mills, R&D's President, to discuss whether to rehire Wigley. (Doc. 23 at Ex. 1 at 60-61, Ex. 2 at 80, Ex. 5 at 60-62, Ex. 8 at 48). Mills agreed with Ferguson that Wigley quit his job on January 11, 2007, when he walked off the job site and turned in his keys and radio. (Id. at Ex. 1 at 31, 62-63, Ex. 8 at 50). Crawford stated that Wigley should not be rehired because of the way that he quit (by walking off the job without notice). (Id. at Ex. 8 at 48-50, 60-61). Ferguson testified that everyone agreed and decided that Wigley would not be reinstated. (Id. at Ex. 2 at 120). At the time, there was not a mechanic position available in Tuscaloosa. (Id. at Ex. 2 at 121). Ferguson invited Wigley back into the office at which time he told Wigley that R&D believed that he had quit

his job on January 11, 2007, and would not rehire him. (Id. at Ex. 2 at 80-82). Wigley testified that at this meeting, Ferguson told him that the company "wasn't going to need [him] no more[]" and that he had been fired. (Doc. 23 at Ex. 3 at 80, 264, 333, 347). Wigley shook Ferguson's hand and left. (Id. at Ex. 7 at 81-82). Wigley testified that he believes that Ferguson terminated him during the January 16, 2007 meeting when he told Wigley that he did not need him any more and could go. (Id. at Ex. 3 at 81, 219-220, 264, 308, 347).

After Wigley left the meeting, he wrote a lengthy letter to Mills regarding his "discharge" and communicating how Montgomery had been "verbally harassing" him and that he felt "like [he had] been discriminated against because of [his] age." (Doc. 26-6 (Plf's January 16, 2007 Letter)).

Wigley asserts that Montgomery called him "an old bastard on many occasions" (citing Doc. 26-2; Doc. 26-4; Doc. 26-12; Doc. 26 at Ex. 3 at 193-194, 323-324, 370-373); Montgomery called him an "old son of a bitch on many occasions" (citing Doc. 26-12; Doc. 22 at Ex. 3 at 193-194, 235-236, 323-324, 370-373); Montgomery "several times [] called [him] an old man in a hateful tone of voice while assigning him difficult tasks" (citing Doc. 26-3); on "more than one occasion" Montgomery told Wigley "he was too old to do his job, and suggested that he quit or get the hell gone" (citing Doc. 22 at Ex. 3 at 370-371; Doc. 26-12); on January 11, 2007, Montgomery called Wigley "an old bastard" and said that he was too old to do the job (citing Doc. 22 at Ex. 3 at 370-371); and on January 11, 2007, Montgomery said to Annie Barton "Old Bastard, he should have known he could not do the job." (citing Doc. 26-2).

On January 17, 2007 a Personnel Status Form was signed by Wigley; it originally stated that Wigley voluntarily quit on January 11, 2007, but Wigley scratched that out and wrote in "verbal harassment" and "age discrimination" under the checked "termination" box. (Doc. 26-5).

9

Subsequently, Wigley filed a timely Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") within 180 days, alleging that he was terminated because of his age. (Doc. 22 at Ex. 4). In his Charge, Wigley states that Montgomery frequently referred to him as "old bastard" and he was offended by his remark and found it to be a demeaning, humiliating and insulting term referring to his age and that due to this treatment he asked for a transfer to another location.[4] (Id.) Wigley states that on January 11, 2007 he went to the Tuscaloosa facility to complain about the morning's events but Montgomery had already told them that he had quit his job, which was false, "I did not quit my job." (Id.) Wigley states that he was denied a transfer and that he had been ordered to attend a training session in Tuscaloosa on January 16, 2007. (Id.) On June 27, 2008, the EEOC issued to Wigley a Notice of Right to Sue, which Plaintiff received on or about June 30, 2008.

## III. Summary Judgment

Summary judgment should be granted only if "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).[5] The

---

[4] Wigley testified that Montgomery called him names like "old bastard" and "old son of a bitch," but he never complained to anyone at R&D who had supervisory authority over Montgomery. (Doc. 22 at Ex. 3 at 288-289). Montgomery testified that he never referred to Wigley as "old", "old bastard", "old son of a bitch" or said anything to him to the effect that he was too old to do the job or for him "to get the hell gone." (Doc. 22 at Ex. 7 at 61). Crawford testified that he never heard Montgomery call Wigley any of these names. (Doc. 26-7 at 53-54, 62). Other employees, Macarthur Williams and Gary Broglen, stated in Declarations that they heard Montgomery refer to Wigley as an "old man" or "old bastard" several times, and Williams observed Montgomery assign Wigley tasks that he would likely be unable to do without assistance. (Doc. 26-3 at ¶3; Doc. 26-4 at ¶3).

[5] Rule 56(c) of the Federal Rules of Civil Procedure, provides that summary judgment shall be granted:

> if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The party seeking summary judgment always bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations omitted). The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Secretary of Dep't of Children & Family Serv., 358 F.3d 804, 809 (11th Cir. 2004), cert. den., 534 U.S. 1081 (2005).

**IV.    Conclusions of Law**

**A.    Relevant Law**

---

FED. R. CIV. P. 56(c).

As detailed *supra*, Wigley alleges an AADEA age discrimination claim against R&D, asserting that R&D terminated him on January 16, 2007 due to his age. (Doc. 2-2). The standards governing AADEA cases are identical to those established for it federal counterpart, the ADEA. See, e.g., Taylor v. City of Demopolis, 2005 WL 3320735, *8, n.6 (S.D. Ala. Dec. 6, 2005) (citing Bonham v. Regions Mortg., Inc., 129 F. Supp. 2d 1315, 1321 (M.D. Ala. 2001)). The AADEA provides "'the remedies, defenses, and statutes of limitations, under this article shall be the same as those authorized by the federal Age Discrimination in Employment Act,' with the only noted exception being that plaintiffs are not required to pursue an administrative remedy prior to filing suit." Id. (citing Ala. Code § 25-1-29 (2005)). Thus, the same analytical framework that applies to the federal Age Discrimination in Employment Act ("ADEA") applies to Plaintiff's claim under the AADEA. See, e.g., Robinson v. Ala. Cent. Credit Union, 964 So.2d 1225, 1228 (Ala. 2007).

The ADEA prohibits an employer from discriminating on the basis of age. 29 U.S.C. § 623(a).[6] A plaintiff may establish a claim of age discrimination under the ADEA by direct or a variation of the four-part test outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) for circumstantial evidence. See, e.g., Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1358 (11th Cir. 1999). The Eleventh Circuit has defined direct evidence of discrimination as "evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." Id. (quoting Carter v. Three Springs Residential Treatment, 132 F.3d 635, 641 (11th Cir. 1998)). "In other words, the evidence must indicate that the

---

[6] The ADEA makes it unlawful for an employer "to . . . discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age[.]" 29 U.S.C. § 623(a)(1). The ADEA applies to individuals who are at least 40 years old. 29 U.S.C. § 631(a).

complained-of employment decision was motivated by the decision-maker's ageism . . . . '[o]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age[]' will constitute direct evidence of discrimination." Id. (quoting Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081-1082 (11th Cir. 1990)).  See also e.g., Hollon v. CSX Transp., Inc., 2008 WL 2157111, *4-8 (M.D. Ala. May 22, 2008).

For a claim of age discrimination (termination) based on circumstantial evidence, the McDonnell Douglas burden-shifting framework applies. See, e.g., Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). Under this framework, the plaintiff first must establish a *prima facie* case of age discrimination: 1) he was a member of the protected group of persons between the ages of 40-70; 2) he was subject to adverse employment action; 3) a substantially younger person filled the position from which he was discharged; and 4) he was qualified to do the job. Id. See also e.g. Damon, 196 F.3d at 1359; Hudson v. Shaw Environmental & Infrastructure, Inc., 267 Fed. Appx. 892, 893 (11th Cir. 2008) (citing Turlington v. Atlanta Gas Light Co., 135 F.3d 1428, 1432 (11th Cir. 1998)). "If a plaintiff establishes a prima facie case of discrimination, the defendant employer must articulate a legitimate, nondiscriminatory reason for the challenged employment action." Chapman, 229 F.3d at 1024. The burden then shifts back to the plaintiff to show that the defendant's stated reason is a pretext – *i.e*., the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997). A plaintiff may overcome the employer's asserted legitimate reasons and avoid summary judgment "either directly by persuading the court that a discriminatory

reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Taylor v. Runyon, 175 F.3d 861, 867 (11th Cir. 1999) (quotation, citation and emphasis omitted).

**B.  Discussion**

This is an age discrimination termination case.  Here, three of the requisite *prima facie* elements are not in dispute (that Wigley is a member of the protected group, that he was qualified to perform his job and that a younger individual replaced him). The factual dispute between the parties rests on whether Wigley was subject to an adverse employment action in January 2007 – *i.e.*, whether Wigley was terminated by R&D or voluntarily quit.  "An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'"  Nettles v. LSG Sky Chefs, 211 Fed. Appx. 837, 838-839 (11th Cir. 2006).

The Court has examined the issue of age discrimination based upon Wigley's alleged termination.  The events occurring on January 11, 2007 and January 16, 2007, are material to this case and are in dispute.  R&D claims that Wigley voluntarily quit, citing the fact that Wigley turned in his keys and radio and walked off the job without permission from his supervisor before his shift was over.  R&D also cites to the fact that Wigley overheard Finley tell Montgomery "your mechanic just quit" but Wigley said nothing to correct that interpretation.  Additionally, R&D asserts that at no time did Wigley correct R&D's belief that he had voluntarily quit, even though he had opportunities to do so both on January 11th and January 16th.  See *supra* Section II.  In stark contrast, Wigley asserts that on January 11, 2007, he asked Barton to hold on to his keys and radio while he

14

left work to travel to the other R&D facility in Tuscaloosa to complain to Ferguson about the extensive discriminatory treatment he had been receiving from Montgomery and to seek a transfer to that facility. Id. Additionally, Wigley vehemently asserts that he did not quit, never said that he quit and that he repeatedly told R&D supervisors and management that he had *not* quit his job. Id. Moreover, Wigley states that he was ordered to report to work at the Tuscaloosa facility on the morning of January 16, 2007 . . . *which he did*. Id.

The Court draws its inferences on summary judgment in favor of the non-moving party; thus, while R&D's interpretation of the events surrounding the manner in which Plaintiff's employment ended is plausible, R&D is currently not entitled to it. See, e.g., Purdee v. Pilot Travel Centers, LLC, Slip Copy, 2009 WL 840195, *9 (S.D. Ga. Mar. 30, 2009). See also e.g., Hernandez v. Communications Unlimited of the South, Inc., 2005 WL 3803064, *11, n.45 (M.D. Ala. Feb. 22, 2005); Boyd v. Province Healthcare Co., Inc., 2005 WL 3132394, *8 (S.D. Ala. Nov. 2, 2005); McCulley v. Allstates Tech. Services, 2005 WL 1475314, *21 (S.D. Ala. Jun.21, 2005). There is an issue of fact as to how Wigley's employment ended, and the Court finds that Wigley has shown that the adverse employment action element of his *prima facie* case is met for the purposes of summary judgment. In sum, "[u]ltimately, the fatal flaw in [R&D's] theories for relief . . . is that [R&D] overlook[s] the he-said/he-said nature of the evidence. Review of the [evidence] reveals two starkly different portrayals of what transpired . . . . [R&D's] contentions may be quite reasonable, and even compelling, if their version of those facts is accepted. However, the Court cannot adopt [R&D's] contested facts on summary judgment, but is instead constrained to credit plaintiff's account . . . . From those facts, a reasonable jury could certainly find that [Wigley was] fired . . . ." Boyd, 2005 WL 3132394, *8.

Having so concluded, the burden shifts to R&D to produce a legitimate, nondiscriminatory reason for Wigley's termination. See, e.g., Chapman, 229 F.3d at 1024. R&D asserts that Wigley voluntarily quit – that R&D did not terminate him. To the extent that R&D offers a reason (as an alternative to its assertion that Wigley quit) R&D asserts simply that "[j]ob abandonment or leaving the work site without permission prior to the end of a shift is a legitimate, non-discriminatory reason for terminating an employee and is, in fact, a ground for termination pursuant to R&D's Company Rules." (Doc. 22 at 22). However, this assertion assumes that Wigley "abandoned" his job (*i.e.*, quit) and this is a fact in dispute such that there is evidence indicating that R&D's proffered "legitimate, non-discriminatory reason" should not be believed. Indeed, while it is true that an employer's good faith, but incorrect, belief that an employee violated a work rule (such as abandoning his job) can constitute a non-discriminatory reason for that employee's termination, Damon, 196 F.3d at 1363, n. 3, a jury could reasonably conclude from the evidence that R&D knew Wigley had not voluntarily quit his job.

When viewing the facts in the light most favorable to Wigley, there exist a number of facts in the record which raise a genuine issue of material fact as to whether R&D's stated reason for terminating Wigley's employment is pretextual. Specifically, R&D's Company Rules do not definitively state that job abandonment or leaving the work site without permission prior to the end of a shift results in termination. Rather, the Company Rules provide for progressive or stepped discipline under the "Conduct that may result in Disciplinary Action" section, and list types of misconduct (such as "leaving work stating without permission") as misconduct "that may result in discipline" but which "will vary depending on the seriousness and frequency of rule violations." (Doc. 23-11). Also, Montgomery testified that R&D employees could leave the facility without

16

notifying a supervisor if the reason for leaving was related to work. (Doc. 22 at Ex. 7 at 27-29). Additionally, Wigley testified that before he left the Demopolis R&D facility, he told Barton (who worked for Montgomery) where he was going and what he was doing – namely, that he was going on a work related trip to the other facility to seek a transfer. Likewise, once at the Tuscaloosa facility – approximately only 1½ hours later (the time it took to drive there)– Wigley told Ferguson he had not quit his job but sought a transfer and Ferguson told Wigley to report to work at that facility, rather than the Demopolis facility, on Tuesday January 16, 2007 for training classes. This could reasonably be construed to indicate that both R&D and Wigley understood that Wigley remained employed, but was to start working at the Tuscaloosa facility instead of the Demopolis facility). Further, Montgomery's alleged numerous remarks about Wigley's age[7] are relevant to the question of pretext, particularly in the context of all the other evidence. See, e.g., Huff v. UARCO, Inc., 122 F.3d 374, 385 (7th Cir. 1997).

In sum, such facts, if believed by a jury, could reasonably undermine R&D's statement that it terminated Wigley for abandoning his job on January 11, 2007, and expose that reason for termination as pretextual. See, e.g., McCulley, 2005 WL 1475314, *21. Thus, this evidence, when considered in light of the fact that "job abandonment" was the sole reason given for Wigley's termination, is sufficient to create a genuine issue of material fact on the issue of pretext.

---

[7] For example, Williams' Declaration states that he heard Montgomery "several times [] called [Wigley] an old man in a hateful tone of voice while assigning him difficult tasks" (citing Doc. 26-3); Wigley's testimony that on "more than one occasion" Montgomery told him that "he was too old to do his job, and suggested that he quit or get the hell gone" (citing Doc. 22 at Ex. 3 at 370-371; Doc. 26-12); and Barton's Declaration that she heard Montgomery say "Old Bastard, he should have known he could not do the job[]" (citing Doc. 26-2).

17

Accordingly, R&D's Motion for Summary Judgment is **DENIED.**[8]

**V.     Conclusion**

Based upon the foregoing, the Court finds that Defendant R&D's Motion for Summary Judgment (Docs. 21, 22, 23) is **DENIED.**

**DONE** and **ORDERED** this the **22nd** day of **July 2009.**

/s/ Kristi K. DuBose
**KRISTI K. DUBOSE**
**UNITED STATES DISTRICT JUDGE**

---

[8]  To the extent that this Order does not address other issues raised in the parties' summary judgment briefing (*e.g.*, back pay, after acquired evidence defense, calculation of damages), those issues will be carried to trial.